

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SANDRA LYNN ELLIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 04 C 8302 |
| ) | |
| JO ANNE B. BARNHART, ) | Judge Ruben Castillo |
| Commissioner of the Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sandra Lynn Ellis applied for disability insurance benefits and supplemental security income from the Social Security Administration ("SSA"). After the SSA denied her application and her reconsideration request, Ellis asked for an evidentiary hearing. The Administrative Law Judge ("ALJ") who conducted this hearing concluded that Ellis was not disabled. After the Social Security Appeals Council denied her request for a review, Ellis sought judicial review of the ALJ's decision. Ellis and the SSA Commissioner, Jo Anne Barnhart, have filed cross-motions for summary judgment seeking to reverse or affirm, respectively, the ALJ's decision. For the reasons provided below, we affirm the ALJ's decision, deny Ellis's motion, (R. 8-1), and grant the SSA Commissioner's motion, (R. 10-1).

### RELEVANT FACTS

**I.  Ellis's Testimony**

Sandra Lynn Ellis was born on June 7, 1955. (R. 6, Admin. R. at 30.) She is single, lives alone, and has three adult children. (*Id.* at 31.) One of her sons occasionally helps her with her

household chores, and her brother drives her to the grocery store. (*Id.* at 37-38.) She completed eleventh grade and at the time of her disability hearing was taking classes to obtain a high school general equivalency diploma. (*Id.* at 31.) She has to walk one and a half blocks to school, and on her longest days, which require her to spend approximately two and a half hours in the classroom, she is a "little tired" when she returns home. (*Id.* at 44.) Over the last two years, she has gained fifty pounds and at the time of her hearing weighed two hundred pounds. (*Id.* at 36-37.) She stated that she can stand up for less than half an hour, can sit for less than an hour, can walk about one and a half blocks, hurts when she stoops, gets stiff in the knees when she bends, and could probably lift about ten pounds. (*Id.* at 34-36.) She stated that she has a hard time taking her medications because she has no income, but she also stated that she does not pay for her medicine out of her own pocket.[1] (*Id.* at 40-41.) She explained that Joliet Township pays her "medical." (*Id.* at 41.) She has previously worked in a factory folding large boxes and as a cashier in a donut shop. (*Id.* at 32-34.)

## II. Ellis's Medical History

### A. Hospital Visits

On May 26, 2000, Ellis was admitted into North Memorial Hospital in Minnesota and was diagnosed with a dissecting thoracic and abdominal aortic aneurysm, hypertension, and mild restrictive lung disease.[2] (*Id.* at 188-189.) At that time she was also experiencing some shortness

---

[1] The record also contains evidence that in May 2001 Schering Laboratories approved her application for medication assistance, (*id.* at 352), and that the Will County Community Health Clinic dispensed medications to her, (*id.* at 338).

[2] A dissecting aortic aneurysm is a tear in the innermost layer of the aorta. *See Mayo Clinic, at* http://www.mayoclinic.org/aortic-aneurysm/dissectingtreatment.html (last accessed on July 25, 2005).

of breath. (*Id.*) She reported that she smoked at least one-third of a pack of cigarettes every day. (*Id.* at 190, 199.) When she was discharged from the hospital, she was doing "well," she was "relatively pain free," and her blood pressure was "well controlled." (*Id.* at 188-189.)

In September and October 2000, Ellis was admitted to the hospital for chest and back pain. (*Id.* at 225, 249, 255.) She denied shortness of breath and extremities complaints. (*Id.* at 227.) She claimed that she had not been taking her medications because she could not afford them. (*Id.* at 225, 255, 256.) One doctor, however, stated that "it sounds as if she took this medication infrequently, not at all, or only some of it." (*Id.* at 227.) She had "[n]o significant joint pain or swelling," (*id.* at 229; *see also id.* at 258), and no exertional symptoms, (*id.* at 257). She stated that she smoked a pack of cigarettes a day, (*id.* at 225), and that she had recently quit smoking, (*id.* at 256, 260). Her records indicate that she was symptom-free with treatment. (*Id.* at 255.) She was told that it was important for her to take her medications. (*Id.* at 224, 228.)

In April 2001, Ellis was seen by Dr. Balbarin, who become her treating physician, at Silver Cross Hospital for hypertension and chills. (*Id.* at 295-99.) Ellis stated that she had not taken her medications for one month and that she smoked occasionally. (*Id.* at 299-300.) After she resumed her medications, her blood pressure went down, and she was sent home in stable condition. (*Id.* at 299.) She was advised to lose weight and quit smoking. (*Id.* at 302.)

In April 2003, Ellis was again seen at Silver Cross Hospital because she was experiencing abdominal pain.[3] (*Id.* at 365.) She denied having chest pain or shortness of breath. (*Id.*) She was unable to tell the attending physician which medications she was taking. (*Id.*) She stated

---

[3] She was seen a second time in this month because she injured her knee in a car accident. (*Id.* at 374.) The medical records from this visit state that her "joints have full range of motion and are without significant pain or tenderness." (*Id.*)

that she smoked at least one-third of a pack of cigarettes a day. (*Id.*; *see also id.* at 368.) She stated that she could not afford her medications, so she was just taking a few of them at a time. (*Id.* at 368.) She had no exertional chest pain, no shortness of breath, and no leg swelling. (*Id.*) She was told to lose weight, and her medical records noted that she might be able to afford generic medications. (*Id.* at 369.) She testified that she "was supposed to call back" to obtain her testing results but didn't because she didn't have a phone. (*Id.* at 48-49.)

### B. Consultative Evaluations

In March 2001, Dr. Shah performed a consultative evaluation. (*Id.* at 280-81.) His report stated that Ellis "denies back pain, joint pain, joint swelling, muscle cramps, muscle weakness, [and] arthritis." (*Id.* at 280.) He found that her "gait/station" was "normal" and that she can "undergo exercise testing and/or participate in exercise program." (*Id.* at 281.) He also found "no joint enlargement or tenderness" in any of her extremities (*Id.*) In May 2002, Dr. Makunda also performed a consultative evaluation. (*Id.* at 312-314.) His report stated that Ellis had no joint inflammation or abnormalities, was "of easy fatigability and has a history of pain in the extremities," had a normal gait, and could "get up and off the couch without assistance." (*Id.* at 313.) Ellis told him that she had been taking her medications, and her blood pressure was 130/80. (*Id.* at 312-13.)

### C. Residual Functional Capacity Assessments

Dr. Burris, a disability determination services physician, conducted a Residual Functional Capacity ("RFC") assessment in October 2000. (*Id.* at 241-48.) He found that Ellis could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk for a total of about six hours in an eight-hour work day, sit for about six hours in an eight-hour workday, could push or

4

pull without any limitations, could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl but could not climb ladders, ropes, or scaffolds, had no manipulative, visual, or communicative limitations, and should avoid moderate exposure to fumes, odors, gases and hazards such as machinery and heights. (*Id.*) He concluded that she can perform light work activities within the noted restrictions. (*Id.* at 248.)

Dr. Nerbury, another disability determination services physician, conducted an RFC assessment in April 2001. (*Id.* at 287-94.) He made identical findings as Dr. Burris, except he found that Ellis could occasionally climb ladders, ropes, or scaffolds and should avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, and gases. Drs. Bergmann and Bone, also disability determination services physicians, conducted an additional RFC assessment in May 2002. (*Id.* at 320-27.) They made identical findings to Dr. Burris, except they found that Ellis had no environmental limitations. (*Id.*)

Finally, Dr. Balbarin, who is Ellis's treating physician, performed an RFC assessment at the request of Ellis's attorney in December 2002. (*Id.* at 332, 358-59.) She found that Ellis was limited to lifting less than ten pounds, frequently or occasionally, standing and walking for about two hours out of an eight-hour day, and sitting for a maximum of four hours out of an eight-hour day. (*Id.*) She found that Ellis needed to change positions after sitting for about thirty minutes and after standing for about fifteen minutes. (*Id.*) She found that Ellis was incapable of stooping, crouching, or climbing ladders and limited to occasional climbing of stairs. (*Id.*) She stated that Ellis's fine and gross manipulation were unaffected, but that her ability to reach and push and pull were affected. (*Id.*) She also stated that Ellis needed to avoid all exposure to extreme heat and cold, high humidity, fumes, odors, dusts, and gases, and avoid even moderate

exposure to various chemicals and environmental irritants. (*Id.*) She stated that Ellis would likely be absent from work more than four days each month. (*Id.*)

### D. Treating Physician's Medical Records

Dr. Balbarin has acted as Ellis's treating physician since April 2001. (*Id.* at 158, 299.) Her records indicate that she saw Ellis four more times before she completed her RFC assessment. On May 8, 2001, she saw Ellis and noted that she had been out of medication for approximately one month. (*Id.* at 318.) On January 29, 2002, she saw Ellis because she needed medication refills and noted that she had been out of medication for "a long time." (*Id.* at 317.) Ellis reported that she was concerned about the skin on her hands. (*Id.*) On March 1, 2002, she saw Ellis on a follow-up visit for her hypertension and because she needed medication refills. (*Id.* at 316.) On June 28, 2002, she saw Ellis because she needed medication refills. (*Id.* at 315.) She noted that Ellis not taken her medications for one week. (*Id.*) She also noted in an October 15, 2002, letter sent to Joliet Township that stated that she had treated Ellis for headaches and dizziness. (*Id.* at 333.) She stated in this letter that Ellis's condition was not disabling. (*Id.*) The purpose of this letter was to determine if Ellis could participate in a work or training assignment. (*Id.*)

After completing her RFC assessment, Dr. Balbarin saw Ellis three more times. On March 11, 2003, Ellis told her that she had been in a car accident and was experiencing leg weakness. (*Id.* at 364.) Ellis also stated that she had not taken her medications for two weeks. (*Id.*) She saw her again on April 28, 2003 when Ellis had the flu. (*Id.* at 363.) She saw her for the final time on October 27, 2003 when Ellis complained about sporadic knee pain. (*Id.* at 362.)

## III. The ALJ's Decision

The ALJ applied the requisite five-step disability analysis.[4] (*Id.* at 16.) Step one requires him to determine if Ellis was performing substantial gainful activity. (*Id.*) He concluded that she has not engaged in substantial gainful activity since she allegedly became disabled. Step two requires him to determine if her impairment is severe, and step three requires him to determine whether her impairment meets or is medically equal to any of the impairments listed in Appendix 1, Subpart P, Regulation No. 4. (*Id.*) To apply these steps, he considered Ellis's medical history and concluded that Ellis had severe impairments— hypertensive cardiovascular disease with a history of noncompliance, obesity, aortic aneurysm, and a respiratory impairment—but that her impairments did not meet and were not medically equal to any of the listed impairments. (*Id.* at 19.) In reaching this conclusion, he found that Dr. Balbarin's RFC assessment was entitled to "minimal weight" because "it is not supported by objective medical findings, [Ellis's] use of medications, or even her complaints when on times she was seen." (*Id.*) Step four required him to determine whether Ellis's RFC permitted her to perform any past relevant work. (*Id.* at 16.) He concluded that she could perform her past relevant work as a cashier. (*Id.* at 21.) In reaching this conclusion, he determined that Ellis's testimony about her impairments was not credible. (*Id.* at 20.) He explained that:

> In evaluating claimant's testimony of pain and limitations, of note is that the record is replete with indications of non-compliance with medication and follow-ups. The record also indicates that when claimant takes medications as prescribed she does well and her hypertension is controlled, i.e., a reading of 130/80 on May 7, 2002.
>
> The claimant's attorney argues that claimant's non-compliance and lack of treatment was due to no income. However, claimant is able to afford cigarettes and still

---

[4] *See* 20 C.F.R. §§ 404.1520 & 416.920.

7

smokes, activity contraindicated by her hypertension and history of aneurysm. Furthermore, she is at times unable to recall the names of her medications, hardly consistent with a person striving to obtain medications. Also indicative of non-compliance is her weight gain and of indifference or non-compliance is her testimony that she did not call up the hospital and find out the result of three days of testing.

The medical and other evidence described above are persuasive that claimant's statements regarding her impairments precluding all work are not credible.

(*Id.* (internal parenthetical citations omitted).) He therefore found that Ellis was not disabled within the meaning of the Social Security Act.[5]

## LEGAL STANDARDS

This Court will affirm the ALJ's decision if it is free from legal error and the factual determinations are supported by substantial evidence. 42 U.S.C. § 405(g); *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (quoting (*Richardson v. Perales*, 402 U.S. 389, 401 (1971)). To determine if a factual decision is based on substantial evidence, we "review the entire administrative record, but do not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Id.* This is a "deferential but not entirely uncritical standard." *Golembiewski*, 322 F.3d at 915.

## ANALYSIS

Ellis asserts that the ALJ made two procedural errors: (1) he erroneously found that the Ellis's treating physician's opinion was only entitled to minimal weight and (2) he erroneously analyzed Ellis's non-compliance with medical advice. For the reasons provided below, we find

---

[5] The ALJ found that Ellis was not disabled after step four so did not apply the fifth step of the disability analysis.

8

that the ALJ did not make any procedural errors because the underlying factual determinations are supported by substantial evidence. Accordingly, we must affirm the ALJ's decision.

## I. Treating Physician's Opinion

A treating physician's opinion is entitled to controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2). The ALJ concluded that Ellis's treating physician's opinion was only entitled to "minimal weight" because it was "not supported by objective medical findings, [Ellis's] use of medication, or even her complaints when on those times she was seen." (R. 6, Admin. R. at 19.) Ellis challenges his conclusion, asserting that her treating physician's opinion was entitled to controlling weight because it was "consistent with the severity of [her] medical condition as a whole and with the evidence from treating medical sources." (R. 9, Pl.'s Mem. at 12.) To resolve this dispute, we must determine whether the ALJ's factual determination that Ellis's treating physician's opinion was "not supported by objective medical findings, [Ellis's] use of medication, or even her complaints when on those times she was seen" was supported by substantial evidence.

The ALJ's decision is supported by substantial evidence because a reasonable mind might consider the supporting evidence contained in the record to be adequate. *See Clifford*, 227 F.3d at 869. A contrary opinion by a non-treating physician does not qualify as substantial evidence, *see Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003), but "it is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation," *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) (citing 20 C.F.R. § 416.927(f)(2)(1)), and ALJs may rely on contrary opinions by consulting

physicians, *see Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004).[6] Indeed, the Seventh Circuit has stated that these opinions may be more impartial because they are free from the biases that could affect the opinions of treating physicians who have a personal relationship with their clients. *See Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001).

In this case, Ellis's treating physician's opinion was inconsistent with three RFC assessments conducted by four non-treating disability determination services physicians. (R. 6, Admin R. at 241-48, 287-94, 320-27.) The record also contained the results of two consultative evaluations, which partially support and partially undermine Dr. Balbarin's opinion. (*Id.* at 280-81, 312-14.) Our review of the record unearthed little objective medical evidence that supports the limitations contained in Dr. Balbarin's RFC assessment. It did, however, reveal that Dr. Balbarin had stated two months before she completed her RFC assessment that Ellis's condition was not disabling. (*Id.* at 333.)

Ellis claims—without citing any specific evidence—that Dr. Balbarin's opinion was consistent with the objective medical evidence because "treating doctors routinely expressed

---

[6] *See also White v. Barnhart*, 2005 WL 1640118, ___ F.3d ___ (7th Cir. 2005) (stating that a physician without an on-going relationship with the claimant is not a treating physician); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) (stating that treating physician's opinion was not entitled to controlling weight because it was based on claimant's subjective complaints); *Johansen v. Barnhart*, 314 F.3d 283, 288 (7th Cir. 2002) (stating that treating physician's opinion was not entitled to controlling weight because it was not supported by additional treating physician's opinions and a consultative opinion); *but see Boiles v. Barnhart*, 395 F.3d 421, 426 (7th Cir. 2005) (stating that the ALJ failed to explain how the other evidence in the record contradicted the treating physician's opinion); *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) (stating that the ALJ "has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable").

concern over [her] condition and prescribed an extensive regimen of medication in an effort to treat her condition." (R. 9, Pl.'s Mem. at 12.) Expressions of concern, however, do not constitute objective medical evidence. Nor does the fact that Ellis had a serious medical condition constitute objective medical evidence that supports Dr. Balbarin's RFC assessment. The most that Ellis's argument establishes is that the objective medical evidence in the record could be interpreted as either consistent with or inconsistent with Dr. Balbarin's opinion. This Court cannot resolve evidentiary conflicts or supplant the ALJ's judgment. Thus, we must affirm the ALJ's factual determination that Dr. Balbarin's opinion was inconsistent with the objective medical evidence.

The ALJ provided two additional reasons for his factual determination: Ellis's unreliable use of medication and the limited nature of the medical complaints that she brought to Dr. Balbarin's attention. We find these reasons to be less persuasive than his first reason, but they also support his decision. First, while the fact that Ellis did not reliably take her medications is not directly relevant to the reliability of Dr. Balbarin's opinion, it does cast doubt—for the reasons provided in the next section—on the actual severity of her impairments. Second, it appears that the ALJ found that Ellis had only complained to Dr. Balbarin of dizziness and headaches. (R. 6, Admin R. at 19.) This is slightly inaccurate. Dr. Balbarin stated in a form letter that she had treated Ellis for dizziness and headaches, but she had also treated her when Ellis was hospitalized for hypertension. This small factual wrinkle, however, is of little importance for two reasons. First, Ellis saw Dr. Balbarin exceedingly infrequently (four times over nearly two years) after her hospitalization and only raised minor health complaints. Second, a mere two months before Dr. Balbarin completed her RFC assessment, Dr. Balbarin stated in a

form that she sent to Joliet Township that Ellis's condition was *not* disabling. (*Id.* at 333.) The different conclusions that she reached on these two occasions indicates that Dr. Balbarin's RFC opinion may have been biased in Ellis's favor. *See Dixon*, 270 F.3d at 1177. The ALJ indicated as much when he stated that Dr. Balbarin's RFC assessment "was obtained in the context of [Ellis's] applications for disability." (R. 6, Admin. R. at 19.) Thus, while the ALJ may have understated the actual complaints that Dr. Balbarin was aware of, he was correct in discounting Dr. Balbarin's opinion because of Ellis's treatment history, which includes her contemporaneous statement that Ellis's condition was not disabling.

Ellis also asserts that the ALJ failed to minimally articulate his "good reasons" for according her treating physician's opinion minimal weight. *See* 20 C.F.R. § 404.1527(d)(2); *Clifford*, 227 F.3d at 870. We disagree. The ALJ provided a thorough description of the objective medical evidence. He provided three reasons to support his reasoning. While he may have made a slight factual error with respect to the complaints Ellis had made to her treating physician, his explanation enabled this Court to understand why and on what basis he rejected Ellis's treating physician's opinion. It is almost always possible to provide a more detailed, more thorough explanation, but the ALJ is not required to explain the role that each piece of evidence had in making these difficult decisions. *See Henderson ex rel. Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999). In this case, the ALJ had to determine whether a treating physician who had seen a claimant—who had a lengthy history of non-compliance with her prescribed medications—infrequently for minor complaints and who had stated in a contemporaneous report that the claimant's condition was not disabling—rendered an opinion that is consistent with substantial evidence in the record. As explained above, the ALJ minimally articulated his

reasoning underlying his difficult factual determination, so we must affirm his decision not to accord the treating physician's opinion controlling weight.

## II. Credibility and Non-Compliance

We must affirm an ALJ's credibility determination unless it is "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). An ALJ must "articulate specific reasons for discounting a claimant's testimony as being less than credible." *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005). An ALJ can consider evidence of non-compliance with medical advice when assessing credibility. Social Security Regulation 96-7p states that:

> the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure. However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

Social Security Ruling, *Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, SSR 96-7p (July 2, 1996).

The ALJ found that Ellis's testimony that her impairments preclude her from working was not credible. (R. 6, Admin. R. at 20.) He explained that he made this credibility determination because Ellis did not comply with her doctor's advice to take her medications even though the medications were effective at controlling her blood pressure. (*Id.*) Consistent with Social Security Regulation 96-7p, the ALJ could rely on her non-compliance as long as he had first considered Ellis's explanations for her non-compliance. Ellis asserted that she did not take

13

her medications because she could not afford them. (*Id.*) The ALJ found this argument unpersuasive because she had money to buy cigarettes. (*Id.*) He also stated that poverty could not fully explain her non-compliance because she (1) smoked, (2) gained weight, (3) could not remember the names of her medications on one occasion, and (4) failed to obtain her testing results on one occasion. (*Id.*) He explained that someone who exhibited these behaviors was not "striving to obtain medications." (*Id.*)

We first consider whether the ALJ's determination that Ellis was not taking her medications for reasons other than their affordability was patently wrong. The ALJ should not have relied on Ellis's smoking or weight gain when assessing her credibility. The Seventh Circuit has held that the addictiveness of smoking makes non-compliance with a doctor's advice to stop smoking an unreliable basis on which to rest a credibility determination. *Schramek v. Apfel*, 226 F.3d 809, 812-13 (7th Cir. 2000). The addictiveness of smoking could cause smokers to irrationally prioritize the purchase of cigarettes over the purchase of medications. Weight gain, like smoking, may be similarly difficult to control so is also an unreliable basis on which to rest a credibility determination.

We nonetheless affirm the ALJ's credibility determination. He properly relied on Ellis's failure to obtain testing results and her inability to remember the names of her medications. These objective behaviors indicate that Ellis was generally indifferent to her doctor's medical advice and make it less likely that she was non-compliant because she was couldn't afford her medications. The ALJ was in the best position to determine if such an inference was appropriate, as he could observe Ellis's demeanor. Accordingly, the ALJ did not err when he found Ellis's

testimony regarding the severity of her impairments was not credible because Ellis did not comply with her doctor's medical advice.[7]

Furthermore, the ALJ did not rely solely on Ellis's non-compliance in finding her testimony incredible. He also relied on the objective medical evidence and other evidence described above. (R. 6, Admin. R. at 20.) He described evidence about her daily routine and her GED classes. (*Id.*) He noted that she took care of most of her household chores and was only a "little tired" after her longest school days. (*Id.*) The ALJ made a slight factual error when he found that her longest days required her to spend four and a half hours in the classroom; Ellis testified that she only spent two and a half hours in the classroom on those days. (*Id.* at 44.) This small factual error, however, does not undermine the ALJ's credibility determination. Thus, the ALJ's credibility determination was supported by substantial evidence and was not patently wrong. Accordingly, we must affirm the ALJ's credibility determination.

Finally, Ellis asserts that the ALJ inappropriately attempted to make his own medical conclusions because he assumed that Ellis could work if she took her prescription medications. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). The ALJ never concluded that Ellis could work if she took her medications. He concluded that her testimony about the severity of her impairments was not credible because, among other reasons, she did not take her medications

---

[7] The record contains additional evidence that undermines Ellis's assertion that she was non-compliant because she could not afford her medications. She testified that she does not pay for her medications out of her own pocket and that Joliet Township pays for her "medical." (*Id.* at 40-41.) Her medical records also indicate that Schering Laboratories and the Will County Community Health Clinic helped her obtain her medications. (*Id.* at 338, 352.) Even though she was getting assistance or had access to assistance, she would sometimes stay off of her medications for long periods of time. (*Id.* at 317.) Even one of her one doctors noted that it sounded like she was taking her medication "infrequently, not at all, or only some of it." (*Id.* at 227.)

as prescribed. Moreover, there was substantial evidence in the record that indicated that her medications greatly helped Ellis control her blood pressure and hypertension. (*Id.* at 188-89, 255, 299, 312-13.) We conclude that the ALJ did not attempt to reach his own medical conclusions, but relied on the medical and other evidence in the record—as well as his own observations—to conclude that her testimony regarding the severity of her impairments was not credible. Thus, Ellis's argument that the ALJ improperly made his own medical conclusions is misplaced.

## CONCLUSION

Our findings here do not in any way diminish our empathy for Ellis's condition, troubles, and pain. We hope that the future will bring improved health and that she will be better able to care for her medical condition. Under the applicable legal standards, however, we must affirm the ALJ's decision because it was free from legal error and based on substantial evidence. This Court is not free to reweigh the evidence and make a new disability decision. Accordingly, we deny Ellis's motion for summary judgment, (R. 8-1), and grant the SSA Commissioner's motion for summary judgment, (R. 10). The Clerk of the Court is instructed to enter a judgment, pursuant to Federal Rule of Civil Procedure 58, in favor of the SSA Commissioner.

Entered: _____
**Judge Ruben Castillo**
**United States District Court**

**Dated: August 10, 2005**